## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**MARC ANDREAS LIECHTI**,

       Debtor.

Case No. **14-61228-7**

---

**MOLLY SCHWARZ**,

       Plaintiff.

-vs-

**MARC ANDREAS LIECHTI**,

       Defendant.

Adv No. **15-00004**

## MEMORANDUM OF DECISION

At Butte in said District this 16th day of December, 2015.

In this adversary proceeding the Plaintiff Molly Schwarz ("Molly" or "Plaintiff") seeks denial of the Debtor/Defendant Marc Andreas Liechti's ("Liechti" or "Debtor") discharge under 11 U.S.C. § 727(a)(4)(A) for knowingly and fraudulently making a false oath or account in connection with his bankruptcy case, and also seeks exception of her claim from Debtor's discharge under 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity. Debtor denies committing fraud or defalcation; denies acting as a fiduciary as that term is used in § 523(a)(4); and denies making false oaths with fraudulent intent. After trial of this matter held on October 1, 2015, the Court granted the parties time to file briefs, which have been

1

submitted and reviewed by the Court together with the record and applicable law. This matter is ready for decision. For the reasons set forth below, a separate judgment shall be entered in favor against the Debtor denying his discharge under § 727(a)(4)(A), but dismissing Plaintiff's second Claim for relief under § 523(a)(4).

This Court has exclusive jurisdiction of the above-captioned Chapter 7 bankruptcy under 28 U.S.C. § 1334(a). This adversary proceeding is related to Liechti's Chapter 7 case, and the parties agree this is a core proceeding under 28 U.S.C. § 157(b)(2). This Memorandum of Decision includes the Court's findings of fact and conclusion of law under F.R.B.P. Rule 7052 (applying Fed. R. Civ. P. 52) in adversary proceedings).

Trial of this cause was held at Missoula on October 1, 2015. Plaintiff Molly Schwarz appeared and testified, represented by attorney James A. Patten of Billings, Montana. Debtor appeared and testified, represented by attorney Harold V. Dye of Missoula. Christy L. Brandon ("Brandon") who is Trustee in Case No. 14-61228-7, testified. By stipulation of counsel at the beginning of trial the following Exhibits ("Ex.") were admitted into evidence without objection: Plaintiff's Ex. A – through – Z; AA – through – ZZ; AAA – through OOO; and Debtor's Ex. 1, 2, 3, 6, 7, 8, 9 and 10. At Debtor's request the Court took judicial notice of Debtor's Schedules, a reaffirmation agreement with First Interstate Bank, and Molly's Proof of Claim No. 5.

## FACTS

The following "Agreed Facts" are set forth in the approved Final Pretrial Order (Document No. 22) signed by counsel for both parties, or by stipulation (Doc. 40):

    a. The Defendant filed a chapter 7 bankruptcy petition on October 28, 2014; he filed schedules and his Statement of Financial Affairs on November 11, 2014.

2

b. The Defendant executed a Declaration that his schedules, including Schedule I, was "true and correct to the best of my knowledge, information, and belief."

c. The Defendant filed form B22A on October 28, 2014.

d. For at least six months prior to Defendant's bankruptcy filing, the Defendant was employed by Apec Inc. as an engineer. The Defendant is the sole shareholder and President of Apec Inc.

e. Through February, 2014, the Defendant was paid a gross wage of $7000 per month by Apec Inc.

f. The Defendant was also paid $1950 per month on a contract with Glacier Ranch, $275 on a contract with Somers Bay, and $80 as a board member of Lakeside Water and Sewer District. These payments were made to Defendant as a proprietorship business known as "Apec Engineering Water and Sewer" ["AEWS"] and were reported on Schedule C of Defendant's personal income tax return.

g. Plaintiff obtained a judgment against Defendant in the amount of $179,070.38 plus interest at 6.5% per annum on May 27, 2011 in DV-11-54 B, Montana Eleventh Judicial District Court, Flathead County, Molly Schwarz v. Marc Liechti.

h. Plaintiff served Apec Inc. with a writ of execution on March 7, 2014 in DV-11-54 B garnishing Defendant's wages from Apec Inc.

I. Apec Inc., through Defendant's wife, Marceen Liechti, responded to the writ of execution calculating the garnished amount of $1449.98 based on Defendant's total earnings of $7000 per month.

j. Apec Inc. did not garnish the Defendant's wage in any of the pay periods for the four months following service of the writ of execution.

k. On July 2, 2014 a new writ of execution was served on Apec Inc. garnishing the Defendant's wages and attaching his corporate stock in Apec Inc.

l. Apec Inc., through Marceen Liechti responded to the second writ of execution notifying the process server that the Defendant was not being paid a wage by Apec Inc.

m. As of April 2014, the Defendant was owed $35,716.67 by Apec Inc.

3

Apec Inc. paid the Defendant, $1000 on April 18; $4000 on May 20; $6000 on May 30; $6000 on July 1; $6000 on July 30; $6000 on August 29; $6000 on October l; and $716.76 on November 24.

n.  Apec Inc. paid the Defendant his $7000 per month salary on March 31 and April 30, 2014. A $7000 per month wage was paid on October 31, 2014 and each month thereafter.

o.  No wages were garnished by Apec Inc. or Apec Water and Sewer Operation or paid to Plaintiff.  No stock of Apec Inc. was delivered to Plaintiff.

p.  On September 29,[1] 2014 the District Court in DV 11-54 B issued an order finding Defendant, Apec Inc., and Apec Water and Sewer Operation in contempt for failing to comply with the writs of execution served by Plaintiff on Apec Inc.

q.  On July 23, 2013, the Defendant purchased a 2013 Ford F150 pickup from DePratu Ford for $41,500. The purchase was paid by $6000 cash and financing from First Interstate Bank for the balance of $35,500. The Defendant executed a promissory note to First Interstate Bank.

r.  The payment to First Interstate Bank on the loan is paid by Apec Engineering Water & Sewer Operations.

Doc. 22, 38.

Other relevant facts may be gleaned from the testimony and exhibits admitted at trial.

Liechti is 50 years old.  He was born in Switzerland, moved to the United States in 1988, and became a naturalized U.S. citizen.  English is not his first language, but he speaks several languages including English.  He is not an accountant or a licensed engineer in Montana, but he earned an engineering degree in Switzerland.  He relies on his wife to perform data entry, bookkeeping and payroll for Apec, and he employs an accounting firm in Kalispell for his accounting and tax needs.  Otherwise, Liechti controls and runs Apec's business.  Liechti

---

[1]This date is mistaken.  Ex. OOO is the Order finding Liechti, Apec, and Apec Water and Sewer Operations in contempt.  Ex. OOO was signed by the district court judge on September 24, 2014, and file stamped September 26, 2014.

testified that he and his wife have separate bank accounts and he is not a signatory on her bank account, nor does he have a debit card on her account.

Ex. 1 is the U.S. form 1040 joint individual income tax return for Liechti and his wife for the tax year 2013. Line 7 of Ex. 1 lists their income in the amount of $91,258. Line 12 of Ex. 1 lists a business loss in the amount of $5,356, and refers to Schedule C. Schedule C is at page 6 of Ex. 1. In Part I of Schedule C ("Income") Liechti listed $9,150 in gross receipts from his sole proprietorship "Water & Sewer Monitoring" which agreed fact "f" states is Liechti's sole proprietorship AEWS. Part II of Schedule C lists "Expenses" and includes a line 26 for "Wages," which was left blank. Asked whether he understands the term "income" Liechti answered "Yes." On cross examination Liechti testified that he did not ask his attorney what "income" meant.

The background between the parties is that Liechti purchased Molly's shares in her company "Schwarz Engineering," where Liechti was employed, in 2006.[2] Ex. 10. Liechti gave Molly a promissory note,[3] and changed the company name to Apec Inc. ("Apec"). Molly sued Liechti after he stopped making payments on the note.

Liechti testified that he had sole control of Apec, signed all of its checks, and controlled all disbursements of Apec's funds. He testified that Apec got into financial trouble. Its income dropped by 80% and it reduced its number of employees from 36 to 6, but Liechti still could not afford to pay Molly.

He testified that he borrowed $40,000 from his brother and put it into Apec. Ex. 3 is

---

[2]According to Ex. 9, p. 7, the structured sale began in 2003.

[3]Molly testified that Liechti also gave her husband a promissory note, which was paid.

5

Apec's tax return for year 2011.  At page 4 of Ex. 3, Schedule L, Line 19 ("Loans from shareholders") lists a loan in the amount of $1,303 at the beginning of the tax year, increasing to $45,381 at the end of tax year.  Ex. 2 is Apec's tax return for 2013.  At page 12 of Ex. 2, Schedule L shows at line 19 a beginning loan balance from shareholders in the amount of $36,212 and an ending balance of $36,716.

Liechti agreed that Apec paid him his regular $7,000 salary in January and February of 2014.  He testified that he was unsure whether he was paid his salary for March 2014, but admitted fact "n" quoted above establishes that he was paid his salary on March 31, and April 30, 2014.  His salary paychecks from Apec in March and April of 2014 and payments made to him through AEWS were sent to him after the date of the district court's writ of execution and garnishment, dated March 4, 2014, Ex. III.

Liechti testified that he told his wife what to write on Ex. NNN, Apec's "Employer Response Form" dated July 17, 2014, in response to Ex. III.  Ex NNN states:  "The writ of garnishment is good for 120 days."  Contrary to admitted fact "n" that Liechti received his salary from Apec in March and April of 2014, his wife wrote on Ex NNN:  "Mr. Liechti is not drawing or has not drawn a paycheck for the last quarter."

Ex. H is a series of nine payments made by Apec to Liechti beginning 4/18/2014 to 11/24/2014, in the total amount of $36,716.67.  He testified that he accepted service of the writ of execution from the Plaintiff on March 14, 2014, over the phone, but that Apec continued to make the payments shown by Ex. H, which he described as repayments for the loan which he made to Apec.

Liechti answered "Correct" when asked if he decided to not take a salary from Apec and

6

instead have Apec repay him for the loan. Asked whether he could have paid himself a salary instead of paying himself loan repayments, Liechti answered that it was his business. He asserted that the writ of attachment did not attach to the loan repayments to him from Apec, and agreed that the loan repayments were close to the same amount as his salary would have been.

The order of contempt issued by the district court in Cause No. DV-11-54 A set a show cause hearing on October 14, 2014, where Liechti could "answer the charge of why he should not be confined for his violations of the law . . . ." Ex. OOO. Molly testified that the show cause hearing was continued until October 28, 2014, and that hearing was not held because of the filing of Liechti's bankruptcy petition. When asked if he filed his bankruptcy petition because of the hearing on contempt Liechti answered: "I believe so. Yeah." He testified that the entire amount of his loan to Apec was paid off in six months after the garnishment order, and that after he filed his bankruptcy petition in October 2014, he again began receiving his salary from Apec in the amount of $7,000 per month.

Debtor filed his Form 22A ("Statement of Current Monthly Income and Means-Test Calculation") on October 28, 2014, which he signed declaring under penalty of perjury that the information provided therein is true and correct. Ex. A is his Form B22A; he states that his current monthly income is $5,799.50. That amount does not include any of the monthly payments from admitted fact "f" coming into AEWS, even though item 4 of Form B22A requires disclosure of income from operation of a business and item 10 requires the Debtor to specify "Income from all other sources."

Debtor filed his first Schedules and Statement of Financial Affairs ("SOFA") on November 11, 2014, Ex. B. He filed amended Schedules B and C on November 21, 2014 (Ex.

C); filed an amended Schedule J on November 25, 2014 (Ex. D); and filed further amended Schedules B and C on May 5, 2015 (Ex. E).  Liechti signed declarations under penalty of perjury stating that his Schedules and SOFA, including amendments, are true and correct.

On his original Schedule B Debtor listed two checking or savings accounts:  "First Interstate Bank 2348" with a current value of $75 and an account at Whitefish Credit Union 4998 jointly held with his wife Marceen with a current value of $395.05.  On direct examination by Plaintiff's counsel Liechti testified that he has a second bank account in November 2014 at First Interstate Bank ("FIB") with an account ending in 7772.  Ex. II is a bank statement for FIB account no. 7772 in the name of "Apec Engineering Water and Sewer Operation Acct" ("AEWS") dated 10/31/2014, with a balance as of the petition date of 10/28/2014 of $2,502.72.  Liechti testified that AEWS is his sole proprietorship, and that FIB account 7772 is his account.  Schedule B on Ex. B does not list any ownership interest in AEWS or FIB account 7772.

On direct examination Plaintiff's counsel questioned Liechti about expenditures listed on bank statements of AEWS account no. 7772 at FIB from the January 2014 bank statement (Ex. Z) through December 2014 (Ex. KK).  Liechti testified that he uses FIB account 7772 for both business and personal purchases, and that while he misidentified a few charges,[4] about 30 to 40 percent (%) of the charges are for business.  The only debit card he has is for the AEWS account no. 7772.

At item 13 of Schedule B Debtor listed his Apex stock with a current value of $0.00.  Item 18 on Ex. B, Schedule B lists "Loan to Apec" with a current value of $716.67, and $35,000

---

[4]He testified that he tells his accountant which purchases are for business purposes and which are personal.

described as "Accrued gross wages (subject to tax withholding) due from Apec, Inc." Item 25 of Schedule B lists Debtor's vehicles, including the 2009 Ford F-150. Liechti testified that the Ford is in his wife's name, but due to the bank's mistake the loan secured by the Ford is in his name, and his wife drives the Ford sometimes.

Schedule F lists Molly's unsecured claim from the judgment and also lists unsecured debts to Glacier Bank ($183,968.53) and U.S. Bank ($15,009.95), which the Debtor testified were debts of Apec for which he gave his personal guarantee.

Schedule I of Ex. B lists Debtor's only monthly income as his $7,000 salary from Apec, with a net monthly income of $5,799.50. Other monthly income on Schedule I is marked $0. Asked on direct examination by Plaintiff about the monthly contract payments to AEWS from Glacier Ranch referred to above in agreed fact "f," Debtor answered: "That wasn't wages." Part 1 of Schedule I instructs the debtor to attach a separate page with information if he or she has more than one job and to include part-time, seasonal or self-employed work. Schedule J of Ex. B lists Debtor's monthly expenses in the total amount of $3,510.85.

The SOFA in Ex. B, p. 32, lists Liechti's income from employment in 2014 to date at item 1 as $23,199.98. Asked on direct examination about that entry, Liechti agreed that number is based on his $7,000 monthly salary from Apec and does not include any of the monthly payments made to AEWS by Glacier Ranch, Somers Bay and as a board member of Lakeside Water and Sewer District described at agreed fact "f." Liechti testified that "I just didn't" consider the payments he received through AEWS as wages, and that he turned over all income from AEWS to his accountant who does his financial work and tells him if he made money. Item 2 of the SOFA, Ex. B at p. 25 ("Income other than from employment or operation of business")

9

is marked "None."  Item 18 ("Nature, location and name of business") at page 37 of Ex. B lists Apec, but does not list AEWS.

When Debtor filed amended Schedules on November 21, 2014, he did not add the AEWS operating account no. 7772 at FIB at item 2 of Schedule B.  Ex. C.  When he again amended Schedule B on May 12, 2015, after the § 341(a) meeting of creditors, he still omitted the AEWS operating account at FIB #7772 at item 2.  Ex. E.  Asked on cross examination for the reason why he did not list account no. 7772 on his Schedule B Liechti answered:  "I made a mistake . . . .  I missed it."

Debtor also failed to list his interest in his sole proprietorship AEWS in his petition, Schedules, or SOFA after amendment.  Asked about why he omitted AEWS Liechti testified "I didn't understand it" and that it was a "misunderstanding on my part" not to list AEWS.  He testified that he did not ask his attorney about the status of his AEWS sole proprietorship.

The SOFA on Ex. E continues to omit from item nos. 1 or 2 Debtor's income from Glacier Ranch, Somers Bay and Lakeside Water and Sewer District.  Debtor testified that the income from Lakeside Water and Sewer District is deposited into Apec's FIB account 2348, and that it is his practice to transfer money from account no. 2348 to account 7772 because he does not have any check blanks for account no. 2348, and it is very rare for him to write checks.[5]  Ex. N – through – Y.

Debtor's amended Schedule J on Ex. D increased his monthly expenses to $5,226.01 and added a $305 car payment.  Debtor testified that he makes a monthly truck payment of $556 out

---

[5]He testified that his truck payment and health insurance are made by automatic transfers; he pays other expenses using a debit card.

of the FIB account # 7772 for a truck which is titled in his wife's name, but that he uses for business and personal use.

Liechti answered "No" when asked by his attorney at trial whether he intended to hinder, delay or defraud his creditors, Trustee, or U.S. Trustee in his Schedules.

The 11 U.S.C. § 341(a) meeting of creditors was held on December 2, 2014, and concluded on January 5, 2015.  Ex. FFF is a declaration under penalty of perjury signed by Debtor on December 2, 2014, stating that he read his Schedules and SOFA and that all of the answers "are true and correct to the best of my knowledge, information and belief."  Debtor testified that the Trustee handed him Ex. FFF at the beginning of the § 341 meeting and had him sign it.  The Trustee testified that the Debtor told her that he read his Schedules and they were complete and accurate.  As discussed above they were not, because they omitted AEWS, the income to AEWS from agreed fact "f," and FIB account no. 7772.

The Trustee testified that she reviewed Debtor's Schedules and investigated his financial affairs prior to the § 341 meeting and that Molly and her husband contacted her prior to the § 341 meeting and informed her about income omitted from Debtor's Schedules, including income of AEWS.  Ex. 9, p. 22.  The Trustee testified that Debtor's Schedules did not list his interest in the sole proprietorship AEWS, did not list the Debtor's FIB bank account no. 7772 and did not list Debtor's income from AEWS or the contract payments from Glacier Ranch, Somers Bay and Lakeside Water and Sewer District.

The Trustee asked Liechti at the § 341 meeting about his monthly income through AEWS, and the Trustee and Liechti each testified that he disclosed the income when asked. Debtor testified that he provided the Trustee with that information and everything else she asked

11

for.  However, his Schedule I and SOFA, amended even after the § 341 meeting where he disclosed them, still failed to list his income through AEWS from Glacier Ranch, Somers Bay and Lakeside Water and Sewer District and failed to list FIB account no. 7772.  Debtor did not amend his Schedules and SOFA to correct those omissions.  The Debtor and Trustee each testified that he provided her with copies of bank statements for account no. 7772 as she requested.

The Trustee testified that information regarding a debtor's business income and expenses is helpful and important for her to understand a debtor's finances.  In addition, she testified that omission of a debtor's income from the Schedules and Form B22A triggers a presumption of abuse by the U.S. Trustee.  Asked under cross examination by Debtor's counsel if the Debtor withheld anything she asked for, the Trustee answered "No" and that the Debtor has been "completely cooperative."[6]  He has given the Trustee his tax returns, Apec's tax returns, bank statements, and vehicle titles including vehicles titled in his wife's name.

Liechti testified that the Trustee has demanded that he turn over his wages.  The Trustee agreed under cross examination that she made such demand and her position is that Debtor's wages are property of the estate.  With respect to his unpaid wages during the several months he took loan repayments instead of salary from May to October of 2014, Liechti testified that those monies were left in Apec's Quickbooks accounts, but he has not set aside cash in Apec's bank accounts to pay his unpaid salary.

Molly initiated this adversary proceeding by filing a complaint on January 29, 2015.  The complaint and approved pretrial order contain two claims for relief.  The first claim for relief

_____

[6]She added that she is having trouble accessing Debtor's Quickbooks software.

seeks denial of Debtor's discharge under § 727(a)(4)(A) for knowingly and fraudulently making false oath or account in his Schedules, SOFA, and Form B22A regarding his income through AEWS and truck payments.  The second claim for relief seeks exception of Molly's claim from Debtor's discharge under § 523(a)(4) for fraud or defalcation in a fiduciary capacity by making loan repayments to himself instead of honoring the writs of execution issued by the state district court in Case No. DV-11-54B.

The Trustee testified that she has not objected to the Debtor's discharge and she has not joined this adversary proceeding.  She explained that under the manual for trustees she is required to undergo a cost-benefit analysis before pursuing a nondischargeability action, including considering the expense of pursuing the action, the likelihood of success on the merits and whether such an action would benefit creditors.  She testified that this Chapter 7 case is an asset case, but that after considering the cost-benefit factors as required by the trustee's manual she decided not to object to Debtor's discharge.

Molly filed Proof of Claim No. 5 on February 26, 2015, asserting an unsecured nonpriority claim in the amount of $231,810.87, based on her judgment against the Debtor.  No objection has been filed to allowance of Molly's claim.  Under 11 U.S.C. § 502(a) Molly's claim is allowed, and her proof of claim constitutes prima facie evidence of its validity and amount under F.R.B.P. 3001(f).

## DISCUSSION

Plaintiff pursues two claims for relief in this adversary proceeding.  First, she seeks denial of Debtor's discharge for knowingly and fraudulently making false oaths and account under § 727(a)(4)(A).  Second, she seeks exception from Debtor's discharge of her claim under

§ 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity.  We begin with her

second claim for relief.

### I.  Count § 523(a)(4) Fraud or Defalcation While Acting in a Fiduciary Capacity.

The Ninth Circuit Bankruptcy Appellate Panel ("BAP") discussed § 523(a)(4) *In re*

*Honkanen*, 446 B.R. 373, 378-79 (9th Cir. BAP 2011):

> Section 523(a)(4) excepts from discharge debts that arise from "fraud or
> defalcation while acting in a fiduciary capacity. . . ."  To prevail on a
> nondischargeability claim under § 523(a)(4) the plaintiff must prove not only the
> debtor's fraud or defalcation, but also that the debtor was acting in a fiduciary
> capacity when the debtor committed the fraud or defalcation.  *See In re Teichman*,
> 774 F.2d 1395, 1398 (9th Cir.1985); and [*In re Bugna*, 33 F.3d 1054, 1057 (9th
> Cir. 1989)].

> The broad definition of fiduciary under nonbankruptcy law—a relationship
> involving trust, confidence, and good faith—is inapplicable in the dischargeability
> context.  *Cal–Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th
> Cir.2003); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th Cir.1987);
> *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986); *Woosley v. Edwards (In re
> Woosley)*, 117 B.R. 524, 529 (9th Cir. BAP 1990).  For purposes of § 523(a)(4),
> the Ninth Circuit has adopted a narrow definition of "fiduciary." To fit within §
> 523(a)(4), the fiduciary relationship must be one arising from an express or
> technical trust that was imposed before, and without reference to, the wrongdoing
> that caused the debt as opposed to a trust *ex maleficio*, constructively imposed
> because of the act of wrongdoing from which the debt arose.  *Ragsdale*, 780 F.2d
> at 796; *Cantrell*, 329 F.3d at 1125 (*citing Lewis v. Scott (In re Lewis)*, 97 F.3d
> 1182, 1185 (9th Cir.1996)).

> While the scope of the term "fiduciary capacity" is a question of federal
> law, the Ninth Circuit has considered state law to ascertain whether the requisite
> trust relationship exists.  *Ragsdale*, 780 F.2d at 796; *In re Cantrell*, 329 F.3d at
> 1125; and *In re Woosley*, 117 B.R. at 529.  For a trust relationship under §
> 523(a)(4) to be established, the applicable state law must clearly define fiduciary
> duties and identify trust property.  *See Runnion v. Pedrazzini (In re Pedrazzini)*,
> 644 F.2d 756, 759 (9th Cir.1981).  Trusts arising as remedial devices to breaches
> of implied or express contracts—such as resulting or constructive trusts—are
> excluded, while statutory trusts that bear the hallmarks of an express trust are not.
> *Id.*; 4 *Collier on Bankruptcy* 523.10[1][d] (Alan N. Resnick & Henry J. Sommer
> eds., 16th ed. 2010).  The mere fact that state law puts two parties in a

14

fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4).  *See generally Pedrazzini*, 644 F.2d at 759.

446 B.R. at 378-79.

Liechti argues that the evidence shows no trust relationship between the parties and no defalcation.  He contends that the writs of execution did not order or require Apec to pay Liechti his salary, which remains a debt owed to him in his Schedules and that Plaintiff could have, but did not, attach Apec's funds, which it used to repay Liechti for loan.

Molly does not attempt to argue that an express trust was created or imposed before the wrongdoing.  However, Molly argues, without citation to Montana authority:  "The duty to comply with a writ of execution arises from a technical trust."  Molly contends that service of writs of execution and the contempt order on Liechti imposed a duty on him to which he was legally bound to respond and comply and a technical trust thereby was created.  She contends that Liechti's disregard of his duty to comply with the writs of execution and contempt order constitutes defalcation in a fiduciary capacity, because he knew his failure to comply was improper as shown by his scheme to characterize Apec's payments to him as loan repayments instead of salary subject to garnishment.

Molly cites *Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 472 (9th Cir. BAP 2015) as support for the finding of a technical trust.  The BAP in *Plyam* vacated and remanded a summary judgment entered by a bankruptcy court in a case in Nevada, finding that the bankruptcy court abused its discretion by giving preclusive effect to a California state court judgment which found a fiduciary relationship existed, in relation to a technical trust for purposes of § 523(a)(4).  *Plyam*, 530 B.R. at 460-61, 473.  In reversing the bankruptcy court, the BAP

looked at Nevada state statutes, where the bankruptcy was filed, and at an operating agreement between the parties and wrote that it could not determine that the evidence established a technical trust which could support § 523(a)(4) nondischargeability, instead of a constructive or resulting trust which is not sufficient to find a § 523(a)(4) fiduciary capacity. *Plyam*, 530 B.R. at 473[7].

No argument or evidence exists in the record to support a finding of an express trust. With respect to a technical trust, this Court has researched the provisions of MONTANA CODE ANNOTATED ("MCA") and Montana case law searching for the term "technical trust." Molly did not provide a citation to any Montana statute which defines "technical trust." The "Montana Trust Code" at MCA § 72-38-101 *et seq*. provides the definitions of kinds of "resulting trust" (§§ 72-38-120; 72-38-121; and 72-38-122). Section 72-38-123 defines "constructive trust." Like Nevada, Montana law does not define a "technical trust."[8] *See, e.g, Plyam*, 530 B.R. at 472.

In *Plyam* the BAP noted Nevada statutes which establish that an operating agreement is central to defining the contours of a fiduciary relationship in a limited liability company and that the parties to an operating agreement have significant latitude in expanding or limiting fiduciary duties. 530 B.R. at 472-73. In the instant case the record does not include the original stock sale agreement between Molly and Liechti or any other agreement describing or imposing on Liechti any fiduciary duties. That absence of evidence weighs against Molly as the party with the burden

---

[7]The BAP found that the bankruptcy court abused its discretion in giving preclusive effect to a California state court judgment that the debtors breached fiduciary duties under California law, because, as the BAP wrote: "We cannot conclude that, as a matter of law, a technical trust existed under Nevada law[,]" and therefore the bankruptcy court could not give preclusive effect for purpose of § 523(a)(4). *Plyam*, 530 B.R. at 460, 473.

[8]The only reference this Court found in Montana case law to the term "technical trust" is in a reference to a party's argument in a 1901 case, *McDonald v. Amer. Nat'lBank*, 25 Mont. 456, 65 P. 896, 909 (1901).

of proof.

The Montana Supreme Court described, as "fiduciary duties," a partner's duties of loyalty and care to other partners under MCA §§ 35-10-405(2), (4), and in the discharge of partners' duty to furnish complete and accurate information concerning a partnership (§ 35-10-403, MCA). *Phelps v. Frampton*, 2007 MT 263, ¶ 30, 339 Mont. 330, 342, 170 P.3d 474, 482. Molly has not cited, and this Court has not found in its own research, any MCA provisions which impose fiduciary duties on judgment debtors in relation to execution and enforcement of judgments. If the Montana legislature had intended to make judgment debtors fiduciaries of judgment creditors, it could have enacted statutes which impose fiduciary obligations on judgment debtors like it imposed upon partners by statute. It did not.

Montana's statutory scheme in aid of execution and collection of judgments is detailed. For example, MCA § 25-9-301(2) provides that from the time a judgment is docketed it becomes a lien upon all real property of the judgment debtor in the county that it either owned by the judgment debtor at the time or afterward acquired. Title 25, Chapter 13, Part 2, MCA, provides methods for enforcement of judgments. Part 3 provides for the contents of writs of execution, and then for execution against a judgment debtor's property by the sheriff or levying officer to satisfy the judgment (§ 25-13-304); for execution of lien on real property of the judgment debtor (§ 25-13-305); or requiring delivery of possession of property (§ 25-13-307); and even execution against the person of the judgment debtor, to arrest and commit the debtor to jail until the debtor pays the judgment (§ 25-13-308). Title 25, Chapter 14, MCA, includes proceedings to require a judgment debtor to appear and answer concerning the judgment debtor's property (§ 25-14-101), and a procedure when a judgment debtor is withholding property from execution (§ 25-14-102).

17

This detailed statutory scheme for execution of judgments could have, like Montana partnership statutes, included the creation of a fiduciary relationship between judgment debtors and judgment creditors. It does not include the creation a fiduciary relationship.

In this Court's view, the most that might reasonably be argued is that Liechti's failure to comply with the writs of execution and contempt order put the parties into a "fiduciary-like relationship" arising as a remedial device. *See, e.g., Honkanen*, 446 B.R. at 379. This Court does not agree that it goes that far, and even if it did, as the BAP recognized in *Honkanen* and the Ninth Circuit more recently noted: "[T]he mere fact that state law places two parties in a fiduciary-like relationship does not necessarily mean that the relationship is a fiduciary relationship under 11 U.S.C. § 523(a)(4)." *Double Bogey, L.P. v. Enea*, 794 F.3d 1047, 1050 (9th Cir. 2015), quoting 4 COLLIER ON BANKRUPTCY, ¶ 523.10 (Alan N. Resnick & Henry J. Sommer eds., 16 ed.). The Ninth Circuit further quoted COLLIER: "If applicable nonbankruptcy law does not clearly and expressly impose trust-like obligations on a party, [courts] will not assume that such duties exist and will not find that there was a fiduciary relationship." *Id.* Montana statutes and case law and the evidence in the record do not "clearly and expressly" impose trust-like obligations on Liechti, and therefore under controlling Ninth Circuit authority this Court cannot find that there was a fiduciary relationship. *Id.*

*Double Bogey* highlights another fatal weakness in Plaintiff's second claim for relief under § 523(a)(4):

> Further, "the fiduciary relationship must be one arising from an express or technical trust, that was imposed *before and without reference* to the wrongdoing that caused the debt. *In re Cantrell*, 329 F.3d at 1125 (emphasis added) (quoting *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996). Thus Section 523(a)(4) applies "only to a debt created by a person who was already a fiduciary

18

> when the debt was created." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333,
> 55 S.Ct. 151, 79 L.Ed. 393 (1934) (internal quotation marks omitted).

*Double Bogey*, 794 F.3d at 1050-51.

Molly offered no evidence showing that Liechti was a fiduciary when the debt was created. Ex. 10 shows that the sale of Apec shares from Molly to Liechti took place in 2006. That sale agreement is not in evidence, but that is the debt for which Molly brought suit against Liechti in DV-11-54 B and obtained judgment and writs of execution and garnishment order. Molly argues that the technical trust arose because Liechti failed his duty to comply with the writs. However, the trust must have been imposed *"before and without reference to* the wrongdoing that caused the debt. *Double Bogey*, 794 F.3d at 1050-51, quoting *Cantrell* and *Lewis v. Scott*, 97 F.3d at 1185 (emphasis in original). Because Liechti's debt to Molly dates back to 2006 and because the fiduciary relationship alleged by Molly refers to Liechti's wrongdoing in failing to comply with the writs in year 2014, § 523(a)(4) does not apply. *Double Bogey,* 794 F.3d at 1050-51. A fiduciary relationship under § 523(a)(4) cannot arise by reference to Liechti's wrongdoing in failing to comply with the writs of execution. *Id.*

Lastly, the Ninth Circuit in *Double Bogey* explains another reason why Liechti's failure to comply with the writs of execution does not clearly and explicitly create a trust relationship in the strict and narrow sense required by § 523(a)(4). 794 F.3d at 1051-52. The Ninth Circuit affirmed a bankruptcy court's finding that alter egos of a corporation under California law, despite the debtors' concession that their corporation was a fiduciary, was insufficient to hold the debtors were fiduciaries as the term is defined in § 523(a)(4). *Double Bogey*, 794 F.3d at 1049-50, 1053. The Ninth Circuit explained that California's alter ego doctrine acts as a "procedural

19

mechanism" which is not itself a claim for substantive relief, but is rather procedural in order that an individual can be held jointly liable for the wrongdoing of the corporate alter ego.  *Double Bogey*, 794 F.3d at 1052.  The court wrote:  "A doctrine which merely supplies an additional judgment defendant *after* liability exists does not clearly and expressly impose trust-like obligations *prior* to the creation of that same liability."  *Id.* at 1052-53 (emphasis in original).

Similarly, the writs of execution and contempt order issued in Cause No. DV-11-54 B are procedural mechanisms to aid in enforcement, collection and execution of a judgment under Title 25, MCA.  They do not clearly and expressly create a trust relationship in the strict and narrow sense required under § 523(a)(4).  *Double Bogey*, 794 F.3d at 1052.  Molly's second claim for relief based on § 523(a)(4) will be dismissed.

**II.  § 727(a)(4)(A) – False Oath or Account**.

Certain principles or factors are common and apply to Molly's first claim for relief which seeks denial of discharge under § 727(a)(4)(A).  First, "[i]n keeping with the 'fresh start' purposes behind the Bankruptcy Court, courts should construe § 727 liberally in favor of the discharge and strictly against a person objecting to the discharge."  *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007). The "fresh start" is explained by the BAP *In re Albarran*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

The general policy of bankruptcy law favors allowing an honest debtor to discharge debts

20

and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128–29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286–87 [] (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 [] (1934)." 498 U.S. at 286. The party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 F. App'x. 589 (9th Cir. 2006).

*Retz* explains a § 727(a)(4)(A) claim:

Section 727(a)(4)(A) states: "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Khalil*, 379 B.R. at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Id.* (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999)).

To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *In re Wills*, 243 B.R. at 62). A finding of

fraudulent intent is a finding of fact reviewed for clear error.  *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir.1986).

The first element that must be proven to deny discharge under § 727(a)(4)(A) is the existence of a false oath in connection with the bankruptcy case. *In re Roberts*, 331 B.R. at 882; see also 11 U.S.C. § 727(a)(4)(A). The bankruptcy court found numerous errors and omissions in Retz's Schedules and SOFA, which can qualify as false oaths under § 727(a)(4)(A).  *See In re Khalil*, 379 B.R. at 172.

*Retz*, 606 F.3d at 1196-97.

 "A false oath may involve a false statement or omission in the debtor's schedules."

*Olympic Coast Inv., Inc. v. Wright (In re Wright)* 364 B.R. 51, 73 (Bankr. D. Mont. 2007),

quoting *Wills*, 243 B.R. at 62.  "All that is required for a denial of discharge under the plain

language of § 727(a)(4)(A) is a single false oath or account."  *Wright*, 364 B.R. at 73; *see Smith*

*v. Grondin (In re Grondin),* 232 B.R. 274, 277 (1st Cir. BAP 1999), citing *Torgenrud v. Schmitz*

*(In re Schmitz)*, 224 B.R. 149 (Bankr. D. Mont. 1998).

Molly argues that Liechti made numerous false oaths in his Schedule B, I, and SOFA

when he signed them repeatedly, including amendments, omitting the monthly income paid to his

sole proprietorship AEWS and the FIB bank account no. 7772 where most of his income was

deposited and disbursed.  Liechti argues that Molly is a vindictive creditor determined to punish

him for declaring bankruptcy.

Liechti's Form B22A and his Schedules and SOFA at Ex. A, B, C, and E all include

declarations signed by Liechti under penalty of perjury that the information contained therein is

true and correct.  Ex. A, B, C, and E further provide that the Debtor read the Schedules and

SOFA.  Ex. FFF, which Liechti signed at the beginning of the § 341(a) meeting of creditors,

repeats that he read his Schedules and SOFA and that all of the answers and information

provided are true and correct.

Each of these declarations are false oaths made by Liechti in connection with the case. Ex. A omits the income which Liechti's sole proprietorship AEWS received during the six months prior to commencement of his bankruptcy case. That income is set forth in agreed fact "f" in the Pretrial Order signed by Liechti's attorney and approved by the Court. The AEWS income also was omitted from the Schedules and SOFA in Ex. B, C, and E where it was required to be disclosed, and which Liechti signed under penalty of perjury declaring that he read them and they were true and correct. The same Schedules and SOFA omit the FIB account no. 7772, which Liechti testified he used extensively for his business and personal expenses. The evidence shows that the first element of § 727(a)(4)(A), that Debtor made false oaths in connection with the case, is satisfied.

The second element that must be proven is that the oath related to a material fact. The Ninth Circuit explains:

> Section 727(a)(4)(A) requires that the relevant false oath must relate to a material fact. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Wills*, 243 B.R. at 62). An omission or misstatement that "detrimentally affects administration of the estate" is material. *In re Wills*, 243 B.R. at 63 (citing 6 Lawrence P. King, et al., *Collier on Bankruptcy* ¶ 727.04[1][b] (15th ed. 1998)).

*Retz*, 606 F.3d at 1198.

Molly contends that the false oaths are material based on the Trustee's testimony that Debtor's income was important for her to understand Debtor's financial condition and because it reflects Debtor's ability to fund a chapter 13 plan and good faith. Liechti contends that the facts

that the Trustee and U.S. Trustee have not joined in objecting to his discharge and that the Trustee testified that Liechti was very cooperative at the § 341 meeting is evidence that the false oaths were not material to administration of the case, citing *Wright*. Molly replies that while the Trustee's decision not to join in objecting to Debtor's discharge may be significant, it is not controlling, and that the court in *Wright* did not address whether the omissions were material. She argues that the Trustee decided not to pursue a claim based on her cost-benefit analysis.

The Court notes the Trustee's absence as a party in this adversary proceeding, but does not consider it dispositive.[9] As this Court noted in *Wright*, even an omission relating to an asset of little value or that would not even be property of the estate is material if the omission detrimentally affects administration of the estate. 364 B.R. at 73-74, quoting *Wills*, 243 B.R. at 62-63; *see also Schmitz*, 224 B.R. at 150-51.

This Court finds and concludes that Plaintiff satisfied her burden of showing that the Debtor's false oaths relate to material facts. AEWS is Liechti's sole proprietorship; its income shown in agreed fact "f" is without dispute property of the estate. AEWS was included in Liechti's federal tax returns, but not his Schedules and SOFA. The FIB bank account no. 7772 was where Liechti deposited his AEWS income and from which he spent most of his business and personal expenses by debit card. The omissions of AEWS, its income and account no. 772 from Debtor's Form B22A, Schedules and SOFA, and Ex. FF, necessarily bear a relationship to the Debtor's business transactions or estate, concern the discovery of assets and business dealings and detrimentally affect administration of the estate. *Retz*, 606 F.3d at 1198.

---

[9]Because Plaintiff brought this adversary proceeding, the Trustee's joinder or separate objection to discharge under § 727(a)(4)(A) would be redundant.

The materiality of the omissions is demonstrated simply by the fact that the Trustee asked Liechti about the bank account and AEWS income at the second § 341(a) meeting of creditors, after Liechti had again signed a declaration under penalty of perjury that the Schedules and SOFA, which omitted the bank account and AEWS, were true and correct.  Ex. FFF.  In *Wright* this Court wrote "a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's prebankruptcy dealing and financial condition."  364 B.R. at 74, quoting 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][b].

Because of Liechti's omissions of AEWS, its income and account no. 7772 from his Schedules and SOFA, even after he filed several amendments and signed Ex. FFF, the Trustee was forced to ask him about AEWS and the bank account at the § 341 meeting, where he finally admitted the existence of AEWS, its income and the bank account.  Because these assets, income and bank account are related to the Debtor's business transactions and estate, concern the discovery of assets and business dealings, and their omission detrimentally affected administration of the estate, the Court finds and concludes that the omissions are material and the second element is satisfied.

The Ninth Circuit explained the third element:

> The third element required by § 727(a)(4)(A) is that the debtor act knowingly in making the false oath.  *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A).  "A debtor 'acts knowingly if he or she acts deliberately and consciously.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Roberts*, 331 B.R. at 883.

*Retz*, 606 F.3d at 1198.

The evidence shows that Liechti acted deliberately and consciously in omitting AEWS,

25

its income and account no. 7772 from his Schedules and SOFA.  He repeatedly signed
declarations under penalty of perjury that the Schedules and SOFA were true and correct.  Ex. A,
B, C, E, FFF.  While carelessness and recklessness are lower standards than "knowing," this
Court observed in *Wright* that "[a] reckless disregard of both the serious nature of the
information sought and the necessary attention to detail and accuracy in answering may rise to
the level of fraudulent intent necessary to bar a discharge."  364 B.R. at 74, quoting 6 COLLIER
ON BANKRUPTCY, ¶ 727.04[1][a].

Liechti is represented in his Chapter 7 case and this adversary proceeding by experienced
bankruptcy counsel.  A person who has consulted with an attorney "can be charged with
constructive knowledge of the law's requirements."  *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d
1044, 1050 (9th Cir.1987).  No evidence exists in the record that Liechti's attorney advised him
to omit AEWS, its income, and account no. 7772 from his Schedules and SOFA.  In any event,
Liechti voluntarily selected his attorney of record and he cannot now avoid the consequences of
any acts or omissions of his freely-selected attorney.  *Pioneer Inv. Servs. Co. v. Brunswick
Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97 (1993).  The Ninth Circuit wrote:  "A debtor cannot,
merely by playing ostrich and burying his head deeply enough in the sand, disclaim all
responsibility for statements which he has made under oath."  *Retz*, 606 F.3d at 1199, quoting
*Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1ˢᵗ Cir. 1987).  The Court notes that Liechti
testified that he did not consult with his attorney about the status of AEWS and that he retains the
services of a public accountant for his accounting and tax needs, but notwithstanding took it upon
himself to omit the AEWS income from his Schedules and SOFA for the reason that he

determined[10] that it was not wages.[11]

Liechti describes his omissions as "mistakes" which are not sufficient to deny his discharge.  Liechti admits making a "mistake" in not listing account no. 7772 in his Schedules, but argues that it was not made knowingly or fraudulently and did not have a material effect on the estate based on the Trustee's testimony that he was completely cooperative and withheld nothing from her.[12]  He asserts that the Trustee's demeanor at trial corrected a misimpression of deceit by Liechti which Molly's attorney was trying to create.

Molly argues that Liechti has not satisfied his burden to disprove the false oaths and his protestations that he simply made a mistake are not believable because he used the debit card on account no. 7772, which is his largest account, numerous times during the same period he was signing his Schedules and amendments which omitted the account.

In *Wright*, this Court accepted as credible Larry Wright's testimony that he omitted valueless and defunct business interests from his schedules by mistake when he prepared his schedules in emergency late-night circumstances, while he was in another state, and without his records.  *Wright*, 364 B.R. at 76.  Those facts in *Wright* are distinguishable from the facts of the

---

[10]No weight is given to any lack of Liechti's proficiency in the English language as an excuse for his mistakes.  He has lived in the United States for decades, owns property and operates businesses here, which require English proficiency.

[11]The Form B22A, Schedules, and SOFA require disclosure of income, not just wages. Schedule C of his personal income tax return, page 6 of Ex. G, has wages at line 26 under "Expenses," not under Part I "Income."

[12]Another rationale for the Trustee's decision not to object to this Debtor's discharge, whether she considered it or not, is that this estate includes ongoing business ventures which the Trustee is trying to administer with the Debtor's cooperation.  An objection to discharge brought by the Trustee would lessen Debtor's incentive to cooperate with the Trustee.

instant case.  Here, the AEWS business interests, AEWS income and bank account no. 7772 are

not shown by the evidence to be valueless and defunct.  On the contrary, agreed fact "f" shows a

steady stream of income to AEWS which Liechti used for his business and personal expenses.  In

addition, the Wrights amended their schedules to include the defunct and valueless business

assets.  364 B.R. at 76.  In the instant case, by contrast, Liechti amended his Schedules and

SOFA, but he never has amended them to include AEWS, its income, or account no. 7772, even

after he disclosed them to the Trustee at the meeting of creditors.  This Court has long noted:

> The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is
> supplied to those interested in the administration of the bankruptcy estate so they
> can rely upon it without the need for the Trustee or other parties to dig out the true
> facts through examination or investigations.

*Wright*, 364 B.R. at 72, quoting *First Nat'l Bank of White Sulphur Springs v. Bastrom (In re*

*Bastrom)*, 106 B.R. 223, 227 (Bankr. D. Mont. 1989); *Schmitz*, 224 B.R. at 151.

Liechti's Schedules and SOFA failed to supply dependable information to the Trustee,

who was forced to inquire about the assets at the meeting of creditors.  For the above reasons, the

Court finds and concludes that Liechti acted knowingly in making the false oaths in his

Schedules and SOFA which omitted AEWS, its income and account no. 7772.

The fourth and final element required of a plaintiff under § 727(a)(4)(A) is to show that

the false oaths were made fraudulently.  *Retz*, 606 F.3d at 1198-99.  The burden on the plaintiff is

to show actual rather than constructive intent on the part of the debtor.  *Retz*, 606 F.3d at 1196;

*Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007),

*aff'd*, 578 F.3d 1167, 1168 (9th Cir.2009).  Plaintiff bears the burden of showing that the debtor

made a false statement or omission in bankruptcy schedules, "(2) at the time *he knew they were*

28

*false;* [and] (3) . . . he made them with the *intention and purpose of deceiving the creditors."*

*Retz*, 606 F.3d at 1198-99, quoting *Khalil*, 379 B.R. at 173 (quoting *Roberts*, 331 B.R. at 884)

(emphasis in original).  The Ninth Circuit further explained:

> Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir.1985); *see also In re Roberts*, 331 B.R. at 884. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. *In re Khalil*, 379 B.R. at 173-75.

> "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *In re Adeeb*, 787 F.2d at 1343. "However, the debtor's reliance must be in good faith." *Id.* The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir.1987). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.*

*Retz*, 606 F.3d at 1199.

Molly contends that Liechti's fraudulent intent is shown by his failure to disclose the

income until he was caught and asked about it by the Trustee at the § 341 meeting.  Liechti

contends that Molly failed to prove fraudulent intent, that no "badges of fraud" were argued or

shown to be present, that he did not list income from AEWS in his Schedules or SOFA because

AEWS lost money in 2013, as shown by his tax returns and his 2014 tax returns were not yet

prepared.  In her reply Molly contends that courts reject Liechti's "no harm no foul" defense to

false oaths, citing *inter alia Massachusetts v. Sohmer (In re Sohmer)*, 434 B.R. 234, 253 (Bankr.

D. Mass. 2010), and argues that his cooperation with the Trustee at the § 341 meeting does not

absolve him of his perjury and false oaths; he still has not amended his schedules to include the

AEWS income and account no. 7772.  Molly argues that Liechti's explanation why he did not list

29

AEWS income in his Schedules and SOFA is not credible because he knew the money was

coming into AEWS and he was in control of spending it from account no. 7772.

In affirming this Court's denial of discharge under § 727(a)(4)(A), and in particular this

Court's finding of the requisite fraudulent intent, the Ninth Circuit wrote in *Retz*:

> The court properly noted that the significant number of falsehoods and omissions,
> together with the failure to amend the Schedules and SOFA in the three years
> between the petition and trial, can constitute reckless indifference to the truth,
> which is evidence of fraudulent intent. *See In re Khalil*, 379 B.R. at 173-75; *see
> also Martin Marietta Materials Sw., Inc. v. Lee (In re Lee)*, 309 B.R. 468, 477
> (Bankr.W.D.Tex.2004).

*Retz*, 606 F.3d at 1199, 1200.

Similar evidence in the instant case shows significant omissions, including Liechti's

failure to amend his Schedules and SOFA even after the meeting of creditors and trial of this

adversary proceeding.  Liechti's numerous declarations under penalty of perjury that the

information in Ex. A, B, C, and E was true and correct, when he was receiving income through

AEWS and moving it into account no. 7772 and spending it, all show reckless indifference or

disregard from the truth which is circumstantial evidence of fraudulent intent.  More evidence of

fraudulent intent exists.

Liechti asks the Court to believe that his testimony that his omissions were a mistake is

credible.  However, he testified that he instructed his wife what to write on Ex. NNN, Apec's

Employer Response Form to the writ of execution, where his wife wrote that Liechti "is not

drawing or has not drawn a paycheck for the last quarter."  Her statement on Ex. NNN is dated

July 17, 2014, and is shown to be false[13] by agreed fact "n" quoted above where he agreed that

---

[13]It is false regardless whether one counts three months (a quarter) back from July 17,
2014, to April 17, 2014, since fact "n" states Liechti received $7,000 in salary on April 30, 2014;

Apec paid him $7,000 per month salary on in March and April of 2014.  The fact that Liechti would cause his wife to make a false statement in response to a writ of execution issued by a state court is circumstantial evidence that he would make omissions in his Schedules and SOFA knowing they were false and with the intention of deceiving the creditors, as he made his wife make false statements on Ex. NNN to deceive the creditors.

Ex. FFF is another declaration under penalty of perjury that Liechti read his Schedules and SOFA and the information provided therein is true and accurate.  Liechti signed Ex. FFF at the beginning of his meeting of creditors on December 2, 2014, and shortly thereafter when confronted by the Trustee admitted that he was receiving income through his sole proprietorship AEWS and had account no. 7772 and that those items were not in the Schedules and SOFA. This shows and this Court finds that he knew his declaration on Ex. FFF was false at the time he signed it and that he made that declaration with the intention of deceiving the creditors.

Little doubt exists that if the Trustee had not asked Liechti about AEWS, its income and account no. 7772 at the creditors' meeting, he never would have admitted to their existence.  He still has not amended his Schedules and SOFA in violation of this Court's longstanding rule described in *Wright*:

> "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately."  *In re Mohring*, 142 B.R. 389, 394 (Bankr. E.D. Cal. 1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994).  Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness.  *Id.*  The debtor has "no discretion in this regard."  *Smith*, 14 Mont. B.R. at 233.  Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.'"  *Mohring*, 142 B.R. at 394.  Failure to

---

or whether one counts the first quarter of 2014, since "n" states he received $7,000 at the end of March 2014.

> follow these precepts results in denial of a debtor's general discharge for harboring
> an intent to conceal property.  11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at
> 753-754.

*Wright,* 364 B.R. at 72-73, quoting *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486

(Bankr. D. Mont. 1996).

The Ninth Circuit affirmed denial of discharge and a finding of fraudulent intent in *Retz*

based on the significant number of omissions and errors, large monetary value of omitted

transfers and the fact that Retz signed his schedules without reading them.  606 F.3d 1189.  In the

instant case Liechti read his Schedules and SOFA, but he signed them under penalty of perjury

omitting AEWS, its income and account no. 7772.  AEWS has a regular income stream, which

Liechti deposited into an undisclosed bank account and spent it on his personal and business

expenses.  Coupled with the other circumstantial evidence of fraudulent intent discussed above,

this Court finds and concludes that Plaintiff satisfied her burden of showing that Liechti made

omissions in this Schedules and SOFA, at a time he knew they were false and with the intention

and purpose of deceiving the creditors in order that he could continue to enjoy the use of the

undisclosed income stream and bank account.  The fourth element of § 727(a)(4)(A) has been

satisfied.

Molly satisfied her burden of proof under all elements of § 727(a)(4)(A) by a

preponderance of the evidence.  The evidence shows that Liechti is not an "honest but

unfortunate" Debtor who is entitled to an unencumbered fresh start.  *Grogan v. Garner*, 498 U.S.

at 286–87.

### CONCLUSIONS OF LAW

1.  This Court has jurisdiction of the above-captioned Chapter 7 bankruptcy under 28

U.S.C. § 1334(a).

2.  This adversary proceeding is related to Liechti's Chapter 7 case under § 1334(a).

3.  This is a core proceeding involving objection to discharge and to determine the dischargeability of a particular debt under 28 U.S.C. §§ 157(b)(2)(I) and (J).

4.  Plaintiff failed to show that Liechti was acting in a fiduciary capacity as defined in this Circuit under 11 U.S.C. § 523(a)(4) when he failed to comply with writs of execution and garnishment.

5.  Plaintiff satisfied her burden of proof to show by a preponderance of the evidence that Debtor knowingly and fraudulently made false oaths in his bankruptcy Schedules, Form B22A and Statement of Financial Affairs by omitting a bank account and monthly income paid to Debtor's sole proprietorship AEWS.

**IT IS ORDERED** a separate judgment shall be entered against the Debtor/Defendant Marc Andreas Liechti, in favor of Plaintiff Molly Schwarz, denying Liechti's discharge under 11 U.S.C. § 727(a)(4)(A) for false oaths; but dismissing Plaintiff's first claim for relief based upon 11 U.S.C. § 523(a)(4).

Honorable Ralph B. Kirscher
Chief U.S. Bankruptcy Judge

33